FIRST NATIONAL BANK OF SOUTH AMBOY, a body corporate, complainant,

*v.*

PERTH AMBOY IRON AND METAL COMPANY, likewise a body corporate, defendant; ANNE BROWN, defendant-respondent, and WESTERN ELECTRIC COMPANY, a corporation, defendant-appellant.

[Argued October 22d, 1935.   Decided January 31st, 1936.]

On appeal from a decree of the court of chancery.

*Mr. Leonard J. Emmerglick,* for the appellant.

*Mr. Martin P. O'Connor,* for the respondent.

The opinion of the court was delivered by

HEHER, J.

This is an interpleader suit. These are the essential facts: Shortly before May 1st, 1931, the Western Electric Company (hereinafter referred to as the "Western Company") advised the Perth Amboy Iron and Metal Company (to be designated as the "Metals Company"), with whom it had had a business relationship for some time, that it would not make further deliveries of scrap metals in quantities needed by the Metals Company, unless satisfactory security were provided. The Metals Company had exhausted its credit with the complainant bank; and, to provide the needed security, the claimant Brown, at its request, borrowed $10,000 from the bank, upon her promissory note secured by collateral. The proceeds of this note were credited to her account with complainant; and, on April 30th, 1931, she drew a check thereon for the stated sum, payable "to the order of Credit of P. A. Iron & Metals Co. for a/c Western Electric Company only." On May 1st, this check was credited to an account opened with the bank on that day ear-marked "P. A. Iron & Metal Co., Inc., for a/c of Western Electric Company under special credit agreement." On that day, the complainant bank, by letter, certified to the Western Company that this sum had been deposited *by the Metals Company,* "as security for the payment by it to the Western Electric Company, Incorporated, of all moneys due on account of salvaged materials heretofore or hereafter delivered by the Western to the depositor from time to time, either under written contract or otherwise." The bank undertook, in the event that "the depositor should default in the payment of any invoices for salvaged materials delivered to it by the Western," to "make immediate payment to the Western out of the aforesaid fund of all amounts over-

due and unpaid;" and it was stipulated that "presentation to the bank by the Western of a request for payment together with a copy of the contract or copy of the shipping documents, if any, and of the unpaid invoice or invoices, shall constitute sufficient proof of default in payment of the amount requested."

Complainant therein also conveyed its assurances that, in case the deposit should be depleted by payments made by it to the Western Company, "the depositor will replenish the same immediately so that a fund of $10,000 shall be on deposit with the bank at all times," and undertook to give notice to the Western Company of the depositor's failure "to replenish the fund within three days from the date of such depletion." It was therein further provided that, "on or after the 31st day of October, 1931, the depositor shall be entitled to receive the full amount of the aforesaid fund or such part thereof as shall not have been duly requested by and/or paid to the Western."

The Metals Company appended its certificate that the statement of the terms and conditions of the deposit contained in the letter was "in accordance with the understanding reached between the Western Electric Company, the First National Bank and the Perth Amboy Iron and Metals Company;" and Brown, on the following day, under her hand, "authorized" complainant "to sign the foregoing letter." But this authorization by Brown was not endorsed upon the copy of the letter forwarded to the Western Company; nor is there any evidence tending to show that the latter company knew that it had been affixed to the copy retained by the bank. It was manifestly a precautionary measure taken by the latter institution for its own protection.

The Western Company had a valid claim on the fund, for merchandise sold and delivered, in the sum of $7,378.10. This sum was paid to it by the bank, upon the presentation of invoices in that amount; and the validity of the payment is not in question. The controversy relates to the balance of the fund. Concededly, the Metals Company, through connivance with employes of the Western Company, secured by theft, during the contract period, salvaged materials exceeding

in amount the balance of the fund in the hands of the bank, and the latter company demanded payment therefor within time; and the decisive question, as stated by respondent's counsel, is whether Brown "acted as guarantor and surety with the full knowledge of all the parties." The vice-chancellor resolved this inquiry in the affirmative, holding that Brown merely "provided security for such material as might be sold," and "in no way undertook to guarantee or insure against theft," and that the "theft could not have occurred without the connivance of one of" the Western Company's employes, for which she "was in no way to blame." He awarded the fund to her. From the consequent decree, the Western Company appeals.

In so holding, the learned vice-chancellor fell into palpable error. Brown was in no sense a party to the contract with the Western Company. She loaned the money to the Metals Company, and took as security a mortgage on lands owned by one of the officers of that company. The fund was deposited with the complainant bank by the Metals Company, and not by Brown, and was to secure the payment of the price of all materials "heretofore or hereafter *delivered* by the Western to the depositor from time to time, either *under written contract* or *otherwise.*" Plainly, she had no title to or interest in the fund. It was expressly provided that, at the expiration of the contract period, the fund, or such portion as remained after the satisfaction of the Western Company's claims for merchandise delivered, should be returned to the Metals Company.

But be this as it may, the value of the merchandise in question is properly chargeable to the fund. In respect to it, a distinction between the conventional sale and delivery of merchandise by the Western Company to the Metals Company, and a delivery made by one of the former's employes under circumstances designed to permit the Metals Company to fraudulently escape payment therefor, is one of form and not of substance. The Metals Company was nevertheless legally obliged to pay for the materials falling into the latter category. The two transactions are distinguishable only by an intention to pay in the one case and its absence in the other. To hold

that this is determinative of the Western Company's right to recourse to the fund for payment is to ignore the relationship between the parties and do violence to the letter and spirit of the contract. The merchandise thus secured was required for the conduct of the business of the Metals Company, and was therefore within the terms of the contract. The essence of the contract between the Western Company, the Metals Company and the bank was that the fund was to stand as security for all moneys due for salvaged materials delivered and not paid for.

And such is the interpretation of the phrase "either under written contract or otherwise," if we apply, in limitation of the meaning of the general term "otherwise" the principle embodied in the maxim *ejusdem generis*. The genus or class comprehended by the anterior special words embraces the obligation to pay for the metals in question. It is not suggested, nor would the notion bear the least semblance of validity, that the price of goods delivered under a wholly oral contract would not be chargeable to the fund. And the obligation has a contractual basis, whether it be termed an implication of fact or a contract implied in law. Under the circumstances, it was open to the Western Company to waive the tort arising from the unlawful conversion, and sue *in assumpsit* for the market value of the goods. One who has wrongfully converted the property of another to his own use is held to an implied promise to pay the owner the market value thereof. The tort feasor may, at the option of the party injured, be treated as having purchased the goods without stipulation as to price, and therefore liable upon an implied undertaking to pay the market value thereof as for goods sold and delivered. "To permit him to deny the promise would enable him to take advantage of his own wrong." *Moore* v. *Richardson, 68 N. J. Law 305; Hirsch* v. *C. W. Leatherbee Lumber Co., 69 N. J. Law 509; Terry* v. *Munger, 121 N. Y. 161; 24 N. E. Rep. 272; 8 L. R. A. 216; Guerini Stone Co.* v. *P. J. Carlin Construction Co., 248 U. S. 334; 39 Sup. Ct. 102; 63 L. Ed. 275; Felder* v. *Reeth, 34 Fed. Rep. (2d) 744.* See, also, *97 A. L. R. 250 et seq.* While it is not a true contract in the sense of one springing from the common intention of the

parties, it is yet, to all intents and purposes, a contract—of the class *obligationes quasi ex contractu*—whose obligation rests upon the fundamental principle of justice that no one ought unjustly to enrich himself at the expense of another. The promise raised by the law, while fictitious, is for all practical. purposes the equivalent of a genuine contractual obligation; and is enforceable, as in the case of true contracts, by the action of *indebitatus assumpsit*. The plaintiff may "dispense with the wrong, and suppose the sale made by his consent." *Lamine* v. *Dorrell, 2 L. R. Ray. 1216; Russell* v. *Bell, 10 M. & W. 340.* This was the common law conception of *quasi* contracts. In the words of Blackstone, they "are such as reason and justice dictate, and which, therefore, the law presumes that every man has contracted to perform; and, upon this presumption, makes him answerable to such persons as suffer by his non-performance." See *2 Bl. Com. 443; 3 Id. 159-166.* As was said by Mr. Justice Allen, in *Cooper* v. *Cooper, 147 Mass. 370:* "The same act or transaction may constitute both a cause of action in contract and in tort, and a party may have an election to pursue either remedy; and in that sense may be said to waive the tort and sue in contract." The doctrine of waiver of tort is merely a question of the election of remedies. *Keener on Quasi-Contracts 159.*

It is worthy of note that the next succeeding clause obligates the bank to pay from the fund "all amounts overdue and unpaid * * * for salvaged materials delivered to it by the Western." The intention of the parties is to be gathered from the whole context.

The decree is accordingly reversed; and the cause is remanded with direction to enter a decree awarding the fund to the Western Electric Company.

*For affirmance*—CASE, BODINE, JJ. 2

*For reversal*—THE CHIEF-JUSTICE, LLOYD, DONGES, HEHER, PERSKIE, HETFIELD, DEAR, WOLFSKEIL, RAFFERTY, JJ. 9.